CONCURRING AND DISSENTING OPINION



No. 04-01-00345-CV



R.V.K.,


Appellant/Cross-Appellee



v.



L.L.K.,


Appellee/Cross-Appellant



From the 45th Judicial District Court, Bexar County, Texas


Trial Court No. 2000-CI-05063


Honorable Phylis J. Speedlin, Judge Presiding



Opinion by: Sarah B. Duncan, Justice

Concurring and Dissenting opinion by: Alma L. López, Chief Justice

Dissenting opinion by: Sandee Bryan Marion, Justice, joined by Catherine Stone, Justice


Sitting: Alma L. López, Chief Justice

 Catherine Stone, Justice

 Paul W. Green, Justice

 Sarah B. Duncan, Justice

 Karen Angelini, Justice

 Sandee Bryan Marion, Justice


Delivered and Filed: February 28, 2003

 I concur in the majority's conclusion that the trial court erred in failing to properly derive a fair
market value for R.V.K.'s ownership interest, but I agree with the dissent that we should address whether
Finn or Keith should be followed in determining whether goodwill should be included in valuing a
professional practice. I also agree with the dissent that we should follow the holding in Keith and the
reasoning in Justice Stewart's concurring opinion in Finn. However, resolving that issue does not resolve
all of the issues raised in this appeal, including the cross-appellant's express challenge to the trial court's
valuation of R.V.K's interest in the Medical Practice Group. (1) 

 The dissent relies on D.H.'s testimony as evidence to support the trial court's valuation
determination and explains the difference between the value D.H. provided and the value the trial court
assigned by permitting the trial court to apply a minority discount. In discussing the minority discount, the
dissent states, "[D]uring cross-examination, D.H. admitted that he had recommended a twenty-five to thirty
percent minority discount in a similar medical practice valuation case where the doctor owned an eight
percent interest in the medical practice. As a result, the trial court properly applied a thirty percent minority
discount and determined that the value of R.V.K.'s stock in the Medical Practice Group was $464,000,
rather than $663,000."

 D.H.'s testimony does not support the dissent's reasoning that the other medical practice valuation
was "similar" to the instant case. D.H. testified that the cases were not similar, and based on D.H.'s
testimony, the minority discount percent to be applied in any given case is entity-specific. (2)
 Therefore, the
trial court could not properly apply a minority discount calculated for another entity in reaching a fair market
value for the interest in the entity in question.

 I do not believe it was appropriate for the trial judge to select a thirty percent minority discount
absent expert testimony that a minority discount should apply and what the minority discount should be for
the particular entity. Much commentary has been written questioning the application of a minority discount
in business appraisals. See generally John C. Coates, IV, "Free Value" as an Avoidable Rule of
Corporate Law: Minority Discounts in Conflict Transactions, 147 U. Pa. L. Rev. 1251, 1280, 1349
(1999) (noting minority discounts are difficult to observe directly and determining the existence of such a
discount requires estimating the synergy value, pure control value, or expropriation value and concluding
that Delaware should continue to reject minority discounts); Barry M. Wertheimer, The Shareholders'
Appraisal Remedy and How Courts Determine Fair Value, 47 Duke L.J. 613, 641-54 (1998) (noting
that a majority of courts reject any attempt to apply a minority discount). Therefore, I concur in the
majority's conclusion that the trial court failed to derive the stock's fair market value and agree that the
cause should be remanded to the trial court for further proceedings.

 Alma L. López, Chief Justice

PUBLISH
1. In her issue on cross-appeal, L.L.K. states:

 In Finding of Fact No. A1, the Court set out the values it found for all community property assets.
[CR193] This was done by reference to an Exhibit A, attached to the Findings. Item 9.4 on Exhibit A
reflects that the Trial Court found the value of the parties' interest in [the Medical Practice Group] to
be $464,000. [L.L.K.] challenges the legal and factual sufficiency of the evidence to support this
finding, and argues instead that the evidence conclusively showed, or the great weight and
preponderance of the evidence established, that the value of the parties' interest in [the Medical
Practice Group] was $663,000, as indicated by expert witness [D.H.], the only expert to testify to fair
market value.

 Contrary to the dissent's assertion, I believe the sufficiency of the evidence to support the trial court's
valuation finding was raised by L.L.K., and R.V.K. cannot preclude this court from considering L.L.K.'s challenge to the
sufficiency of the evidence by arguing in support of the trial court's finding in his reply brief.
2. The following excerpts from the trial testimony refute the dissent's contention that the other medical practice
valuation case was similar to the instant case:



 I don't see on here anywhere where you used a minority discount. Did you in this case apply a minority
discount?



 No. I did not.



 Isn't it true, sir, that when you have a minority position such as [R.V.K.] it is customary and usual to apply a
minority discount?



 If, in fact, they're a majority - just - If they're a majority of people. In this particular case, there are 21 owners.
No one controls the unit so you don't have the same circumstances you normally have when you - and in a
normal circumstance where there is a controlling - In the theory of business valuation, the minority interest
discount is the inverse of the controlled premium. There is no controlled premium when you have 21 owners.



 I'm not asking you about controlled premium; I'm asking you about minority discount. And what I'm saying
is, if you've got a 4 percent interest, isn't is usual and customary to apply a minority discount?



 Depending on the circumstances, more often than not, you would have one. In this particular instance, we did
not. We had 20 owners; all of them have the same ownership in this entity. No one controls the entity.


**************



 Let me just make sure that I've got this right. In a situation where you have a minority position such as
[R.V.K.], isn't it true it's customary and usual to apply a minority discount of between 5 and 35 percent to come
to the value of his shares?



 It is customary to evaluate the necessity of a minority discount, Mr. Bashara.



 I'm not asking -



 I'm not telling you that it is at all times customary that it be from this range to that range or that it even exists.
[omitting objections and discussion]. . . I think in many instances a minority discount - something 20 to 40
percent - I might have even testified at some time, 25 to 35 percent - in many times [is] an appropriate discount.
Sometimes there is no discount. Other times it's very large. I recently had a case where it was 70 percent.


*****************



 And, sir, I want you to give me any sapient facts that you can recall that distinguishes Dr. Moore's situation
from an evaluation standpoint from [R.V.K.'s] other than the side of the case that you were on.


[Omitting objections and discussion]


 I valued HAVIT for purposes of a shareholder agreement. I didn't value Dr. Moore as a separate matter. . . . I
think Mr. Bashara, there is a huge difference between a shareholder group that numbers 21 people and a
shareholder group that was, in my memory, 8 to 9 maybe 10 people. They had a bunch of entries and exits
during that period of time.


 And, you know, if it's - I think we read in there it was 8.33 percent, which would indicate that there
were 12 people in the group. The value of the entity was in the nonvoting stock. They had two classes of
stock. They all had equal vote, but they did not have equal value in the company. And in that particular - And
so that is a distinction between what you have with the radiology group and what you had at HAVIT. It isn't
- Is it routine to do minority discounts? Most of the time. But what the minority interest discount is, is the
inverse of the control premium. And that is consistent with all of the literature on business valuation.

 And if there's no control premium, you don't have to apply it. And there is no control premium in this
case.